**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **BROADVOX-CLEC, LLC,** | * |
| Plaintiff/Counter-Defendant, | * |
| v. | *   Case No.: PWG-13-1130 |
| **AT&T CORPORATION,** | * |
| Defendant/Counter-Plaintiff. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiff/Counter-Defendant Broadvox-CLEC, LLC ("Broadvox"), a competitive local exchange carrier, partners with third-party carriers to provide long-distance telephone access services to Defendant/Counter-Plaintiff AT&T Corporation ("AT&T"), an interexchange (long-distance) carrier. These calls do not terminate at either Broadvox's or the third-party carriers' facilities. Broadvox seeks payment for those services, alleging that AT&T violated its federal and state tariffs (which set forth the rates it charges for its services) and the Communications Act, 47 U.S.C. §§ 201 and 203, through its failure to pay and its allegedly discriminatory payment practices, and also seeks recovery in *quantum meruit*. AT&T counterclaims to recover any potential overpayment, alleging violations of the Communications Act based on AT&T's view that Broadview neither qualifies as a "domestic access" provider, nor operates an "'end office' switch,"[1] and seeking a declaratory judgment confirming AT&T's view of Broadvox's status under the Communications Act. Countercl. ¶¶ 61, 74, 92–95.

---

[1] "[E]nd office switching rates are among the highest recurring intercarrier compensation charges." *AT&T Corp. v. YMax Commc'ns Corp.*, EB-10-MD-005, 26 FCC Rcd. 5742, ¶ 40 (2011).

Some or all of the parties' claims may present issues that fall within the purview of the Federal Communications Commission (the "FCC" or the "Commission"). In a July 2, 2014 Memorandum Opinion and Order, I ordered the parties to brief the issue of primary jurisdiction. ECF Nos. 40 & 41. The briefing is complete,[2] and Broadvox also has filed a Motion Requesting the Court to Establish a Summary Judgment Briefing Schedule and Memorandum in Support ("Broadvox Supp."), based on its contention that the FCC "issued an order on February 11, 2015 fully resolving those issues [that may have been appropriate for referral to the FCC] and obviating any perceived need for a referral," ECF Nos. 64 & 64-1. AT&T has filed a response ("AT&T Supp. Resp."), ECF No. 65, and Broadvox has filed a reply ("Broadvox Supp. Reply"), ECF No. 66. Because the FCC already has provided sufficient guidance on any issues that otherwise would have been appropriate for referral, I conclude that a primary jurisdiction referral is not necessary with regard to the issues raised in the tariff claims. Nor is a referral necessary at this time with regard to the Communications Act and *quantum meruit* claims.

## I. BACKGROUND

Broadvox is a local exchange carrier ("LEC") that bills AT&T for two "access services" for which AT&T does not believe it should be charged. The first disputed access service is provided when AT&T customers place prepaid calling card ("PPCC") calls by dialing telephone numbers that Broadvox provides, which AT&T then transmits to a Broadvox facility, from which Broadvox and its PPCC provider partner "route[] them to a calling 'platform,'" where

---

[2] AT&T filed the opening brief ("Br."), ECF No. 48; Broadvox filed a Response, ECF No. 57; and AT&T filed a Reply, ECF No. 59. A hearing is not necessary. *See* Loc. R. 105.6. Broadvox also filed a Consent Motion to Seal its Brief, ECF No. 56. Given that AT&T does not oppose the Motion to Seal; the brief contains "trade secrets, and other commercial confidential information"; and Broadvox filed a redacted version available to the public, ECF No. 58, the Motion to Seal IS GRANTED. Although the brief is sealed, I have determined, after reviewing this Memorandum Opinion and Order, that none of its contents warrants sealing this Memorandum Opinion and Order, in whole or in part.

they terminate in internet protocol ("IP") format. AT&T Br. 3; *see* Broadvox Supp. Reply 13. At that point, the customer dials a second number and an unknown third-party network delivers the call its recipient. AT&T Br. 3. This is called a "two-stage call," and the issue is whether Broadvox may bill AT&T access charges for "routing the call to its routing partner" and then "terminating" the call by routing it to the platform, when Broadvox and its PPCC provider partner deliver the call to the platform at the end of the first stage but not to its ultimate recipient. *Id.* at 3–4; *see* Broadvox Resp. 5; Broadvox Supp. Reply 13–14.

The second disputed service is provided when Broadvox receives calls in IP format from AT&T, via a Voice over Internet Protocol ("VoIP") provider that Broadvox selects, and then "hand[s] off the call to an over-the-top VoIP provider" that "dump[s] the IP packets for the call . . . into the public Internet." AT&T Br. 6. An unaffiliated internet service provider then transfers the call "to the neighborhood IP broadband facilities used by the called party's broadband service provider," and that provider delivers the call to its recipient. *Id.* This is called "over-the-top VoIP traffic." The dispute, similar to the two-stage call dispute, is whether Broadvox may bill AT&T for an "'end office switching' rate element," even though Broadvox is not "involved in the 'last-mile' delivery of the call." *Id.* at 6–7. Reduced to its essentials, Broadvox argues that AT&T has failed to pay its bills, and AT&T argues that it has been charged improperly because Broadvox charges for terminating calls when it is not, according to AT&T, actually terminating the calls.

These otherwise-simple disputes may "'require[] the resolution of issues which, under a regulatory scheme, have been placed within the special competence'" of the FCC, such that, under the primary jurisdiction doctrine, it may be appropriate to stay proceedings in this Court "'pending referral of such issues to the administrative body for its views.'" *Advamtel, LLC v.*

*AT&T Corp.*, 105 F. Supp. 2d 507, 511 (E.D. Va. 2000); *see Reiter v. Cooper*, 507 U.S. 258, 268 (1993); *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 262 n.7 (4th Cir. 2001). This doctrine applies when a suit filed in district court "raises a difficult, technical question that falls within the expertise of a particular agency." *Piney Run*, 268 F.3d at 262 n.7. It allows courts to "'tak[e] advantage of agency expertise and refer[] issues of fact not within the conventional expertise of judges,'" as well as "'cases which require the exercise of administrative discretion,'" to the appropriate administrative agency so that the decision-making of the court and the agency is coordinated. *Advamtel*, 105 F. Supp. 2d at 511 (quoting *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996)).

For example, courts typically refer issues concerning "the reasonableness of a carrier's tariff" to the FCC under the primary jurisdiction doctrine "because that question requires the technical and policy expertise of the agency, and because it is important to have a uniform national standard concerning the reasonableness of a carrier's tariff, as a tariff can affect the entire telecommunications industry." *Id.* (footnote omitted). In contrast, a court would not refer "an action seeking the enforcement of an established tariff," because "enforcement of a tariff to collect amounts due under it is well within the ordinary competence of courts," given that "a tariff is essentially an offer to contract," and "such an action is simply one for the enforcement of a contract." *Id.* (footnote omitted). In *Advamtel*, the court referred two counts that "require[d] an evaluation of the reasonableness of plaintiffs' rates . . . , issues that are plainly within the FCC's special competence and primary jurisdiction." *Id.* at 512. It did not refer the other four counts, which "involve[d] a threshold legal question, namely whether plaintiffs had a right to bill AT&T for the access services at issue in th[at] case," a question that was "well within the ordinary competence of courts." *Id.*

Yet, an issue should not be referred if the agency "has already issued guidance on [the] issue." *Advamtel*, 105 F. Supp. 2d at 513 n.13. Moreover, referral is not mandatory; rather, "courts must . . . balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 511. Additionally, if a court refers some, but not all, claims to an agency, it needs to determine whether the remaining claims should be stayed. *See id.* at 513. "A court may, in its discretion, stay proceedings pending determination by an administrative agency pursuant to the doctrine of primary jurisdiction." *Id.* In *Advamtel*, the court decided against staying the claims it did not refer because "the referred issue" was "secondary" to "the predicate, or primary issue" posed by the remaining claims, such that determination of the primary issue did "not depend in any way on the resolution of the issues referred to the FCC." *Id.* The court also reasoned that, "because proceedings before an administrative agency typically take several years, a stay would significantly delay resolution of th[e] case." *Id.*

I asked the parties to address (1) "whether each claim presents threshold legal questions for the court, or technical or policy questions for the FCC," (2) "whether the FCC has offered guidance on any questions that the claims pose within its expertise," and (3) "whether, with regard to any claim that should be referred to the FCC, the claim presents a primary issue, which requires the stay of the remaining claims, or secondary issue whose resolution will not affect the remaining claims." Mem. Op. 12.

## II.  DISCUSSION

In AT&T's view, the issues concerning the services for which Broadvox may bill AT&T involve questions that the FCC should answer, but referral is unnecessary because the FCC already has provided guidance on these issues. AT&T's Br. 1. Nonetheless, AT&T urges the

Court to refer the case "if the parties' briefs give the Court concerns that the FCC's guidance is not sufficiently clear," AT&T Reply 2, or if the guidance does not lead the Court to rule in AT&T's favor, AT&T Supp. Resp. 7. Broadvox agrees that "a primary jurisdiction referral is unnecessary," but for a different reason: Broadvox contends that "[t]his is a straightforward collections action to enforce the plain language of Broadvox's tariff,[] and there are no 'technical or policy questions' that require the expertise of the FCC."[3] Broadvox Resp. 1. Alternatively, Broadvox contends that, to the extent the Court requires the FCC's guidance, the FCC provided the necessary guidance in a recent ruling, Declaratory Ruling, *In re Connect America Fund*, No. 01-92, 2015 WL 628983 (FCC Feb. 11, 2015) ("2015 Declaratory Ruling" or "*In re Connect Am. Fund*"). Broadvox Supp. 1.

Broadvox contends that 47 C.F.R. § 51.913(b), the "VoIP Symmetry Rule" that the FCC implemented in the December 29, 2011 Connect America Fund Order and clarified in the 2015 Declaratory Ruling, permits it to bill AT&T for access services provided in conjunction with calls passed to over-the-top VoIP providers. Broadvox Resp. 5; Broadvox Supp. 2. In Broadvox's view, "[t]he Court can resolve this issue strictly by reference to the [FCC's] rules and orders." Broadvox Resp. 8. Broadvox argues that the same analysis applies to its purported right to bill for access services in pre-paid calling card calls, which it contends are "just another version" of the call traffic at issue when VoIP partners are used. *Id.* at 9. Broadvox insists that the 2015 Declaratory Ruling directly supports its position. Broadvox Supp. 4.

---

[3] Broadvox's opposition to referral is based, in part, on "the FCC's track record of deferring resolution of critical issues for extended periods of time." Broadvox Resp. 2. AT&T replies that "whether there is a risk of delay by the agency is not dispositive," and urges the Court to focus on "whether, given the nature of the issues, allowing the agency to decide technical and policy issues would ultimately result in a more uniform and conclusive resolution of the dispute." AT&T Reply 2.

The FCC issued the 2015 Declaratory Ruling "to ensure that the policies enacted by Congress and implemented by the Commission embrace modern communications networks, and encourage the deployment of, and transition to, IP-based networks and services." *In re Connect Am. Fund*, 2015 WL 628983, ¶ 1. The FCC observed that voice communication services that historically ran on "a network based on time-division multiplexed (TDM) circuit-switched voice services running on copper loops," now more and more frequently run on "an all-Internet Protocol (IP) using copper, co-axial cable, wireless, and fiber as physical infrastructure." *Id.* ¶ 1 n.1. It sought to clarify in its ruling that "the VoIP symmetry rule applies in a technology- and facilities-neutral manner." *Id.* ¶ 1.

To this end, the FCC stated that the VoIP symmetry rule "does not require, and has never required, an entity to use a specific technology or its own facilities in order for the service it provides to be considered the functional equivalent of end office switching." *Id.* ¶ 3. It ruled that "a competitive LEC partnering with a facilities-based VoIP provider," i.e., one that provides VoIP service *and* the last-mile facility to the customer, "provides the 'functional equivalent' of end office switching." *Id.* It further ruled that "the same is true when the competitive LEC partners with an over-the-top VoIP provider," i.e., one that provides *only* VoIP service *and not* the last-mile facility, "to exchange traffic with interconnected carriers, and in both instances the competitive LECs may assess end office switching charges for such services." *Id.*

Thus, "a competitive LEC or its VoIP provider partner" can "provide the functional equivalent of end office switching, and . . . be eligible to assess access charges for this service," even if it does not "provide the physical last-mile facility to the VoIP provider's end user customers." *Id.* ¶ 19. Partnerships with facilities-based VoIP providers and over-the-top VoIP providers are treated the same, such that "compensation [is due] for new and non-traditional

functionality." *Id.* ¶ 20. "The rule places no restrictions on the types of VoIP providers with which competitive LECs may form partnerships," such that "[c]ompetitive LECs may partner with a variety of VoIP partners and collect symmetrical access charges for covered services as long as one of the partners jointly providing a call delivers the end office switching functionality." *Id.* ¶ 21.

The FCC observed that this "new functional equivalence approach to VoIP-PSTN traffic," which "takes a more holistic look at how calls are delivered to the end user, and represents a departure from prior Commission policy in which providers were allowed to charge access for services that only they themselves provided," was the best way to "balance[] its policy goals of promoting competition in the voice marketplace, encouraging migration to all-IP networks, reducing intercarrier compensation disputes, providing greater certainty to the industry regarding intercarrier compensation revenue streams, and avoiding marketplace distortions and arbitrage that could arise from an asymmetrical approach to compensation." *Id.* ¶ 26. The FCC stated that it "decline[d] to adopt . . . a constricted, narrow interpretation of 'functionally equivalent,'" under which "the Commission [would] look to key physical switching functions identified in the TDM network, and attempt to identify similar physical functions in the IP network to determine whether the functional equivalent of end office switching occurs for competitive LECs partnering with over-the-top VoIP providers." *Id.* ¶ 27. Instead, the FCC concluded that, "under the VoIP symmetry rule, the functional equivalent of end-office switching exists when the intelligence associated with call set-up, supervision and management is provided," *id.* ¶ 28, and that "competitive LECs and their over-the-top VoIP partners undoubtedly provide th[is] call intelligence," such that the call control functions they jointly provide "are the functional equivalent of end-office switching," *id.* ¶ 29; *see id* ¶ 31 (concluding

that, "under section 51.903 of [the FCC] rules, a competitive LEC in conjunction with its over-the-top VoIP provider partner provides the functional equivalent of end office switching").

Following the FCC's 2015 Declaratory Ruling, AT&T concedes that "a local exchange carrier may impose end office switching charges on over-the-top VoIP traffic" under the FCC rules. AT&T Supp. Resp. 2; *see id.* at 3 ("[T]he Court no longer needs to address the scope of the FCC's 'VoIP-PSTN[4] rules with respect to over-the-top traffic."). Nonetheless, AT&T maintains that Broadvox cannot impose any of the disputed charges on AT&T, for the reasons discussed in the sections that follow. *Id.* at 2.

A. **Switching Charges on Over-the-Top VoIP Traffic**

AT&T argues that Broadvox cannot impose on AT&T the end office switching charges because "Broadvox's *tariff* does not permit it to impose end office switching charges." AT&T Supp. Resp. 2 (emphasis in original). Broadvox counters that the language of its tariff permits it to charge AT&T end office switching charges because "Broadvox has tariffed the VoIP Symmetry Rule and can therefore charge for access services it provides in partnership with VoIP providers and in circumstances where it provides the functional equivalent of traditional TDM-based services end office switching." Broadvox Supp. Reply 5. In Broadvox's view, "Section 3.8.4, [which incorporates the VoIP symmetry rule,] by its plain language, applies the VoIP Symmetry Rule to the billing of the rate elements contained elsewhere in Broadvox's tariff." *Id.* at 7. While conceding that Broadvox's tariff incorporates the VoIP symmetry rule, AT&T argues that "Broadvox's 'incorporation' of the language of Section 51.913(b), which nowhere contains the words 'end office' or 'end office switching,' cannot trump the other tariff provisions that explicitly address end office switching." AT&T Supp. Resp. 6–7.

---

[4] PSTN stands for Public Switched Telephone Network. *In re Connect Am. Fund*, 2015 WL 628983, ¶ 2 n.3.

AT&T insists that, although ordinarily the FCC would need to determine whether the "technical terms of Broadvox's tariff" permit it to impose these charges, the FCC previously resolved the issue in another case "involving tariff provisions that define 'end office switching' in the same essential way as in Broadvox's tariff," *AT&T Corp. v. YMax Communications Corp.*, EB-10-MD-005, 26 FCC Rcd. 5742, ¶ 40 (2011). AT&T's Br. 7. According to AT&T, in *YMax*, the FCC held that the language used in the tariff at issue in that case, which is the same language used in Broadvox's tariff, "does not permit it to charge AT&T end office switching charges on over-the-top traffic." AT&T Supp. Resp. 5. AT&T asserts:

> [I]f the inclusion in Broadvox's tariff of the language from 47 C.F.R. § 51.913(b), along with the end office switching provisions at issue in *YMax*, generates any doubt in the Court's mind that *YMax* controls the tariff interpretation issue and directs a ruling in AT&T's favor (an issue the FCC has not specifically addressed), then it should refer the issue to the FCC for resolution of the tariff interpretation question.

*Id*. at 7.

Thus, the issue is whether Broadvox may impose end office switching charges on over-the-top VoIP traffic, when its tariff includes both specific language about end office switching that does not refer to over-the-top VoIP traffic, and general language incorporating the VoIP symmetry rule with regard to "switched access charges," which Broadvox insists "includes 'end office switching.'" Broadvox Supp. Reply 10. This is not a matter of "reasonableness" that needs to be referred to the FCC. *See Advamtel, LLC v. AT&T Corp.*, 105 F. Supp. 2d 507, 511 (E.D. Va. 2000). Rather, it concerns contract interpretation and "whether [Broadvox] ha[s] a right to bill AT&T for the access services," questions that are "well within the ordinary competence of courts." *Id.* at 512; *see United States v. W. Pac. R.R.*, 352 U.S. 59, 65–66 (1956) ("[W]here the question is simply one of construction the courts may pass on it as an issue 'solely of law.'") (quoting *Great N. Ry. v. Merchants Elevator Co.*, 259 U.S. 285, 291 (1922)).

It is true that

> [W]here words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that "the inquiry is essentially one of fact and of discretion in technical matters," then the issue of tariff application must first go to the Commission. The reason is plainly set forth: such a "determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the subject matter] is indispensable, and such acquaintance is commonly to be found only in a body of experts."

*W. Pac. R.R.*, 352 U.S. at 66 (quoting *Great N. Ry.*, 259 U.S. at 291). But this is not an instance requiring review of "'voluminous and conflicting evidence'" by experts "'acquaint[ed] with many intricate facts.'" *See id.* (quoting *Great N. Ry.*, 259 U.S. at 291). Rather, the FCC has addressed the scope of end office switching charges in a similar tariff, *see AT&T Corp. v. YMax Commc'ns Corp.*, EB-10-MD-005, 26 FCC Rcd. 5742, ¶ 40 (2011), as has the Fourth Circuit, *see CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364 (4th Cir. 2014), and the FCC recently provided guidance on the interplay between the VoIP symmetry rule and these decisions, *see In re Connect Am. Fund*, 2015 WL 628983, ¶¶ 33–35, 39–40. Further, the evidence to be reviewed comprises only Broadvox's tariff and perhaps, as relevant, the tariffs at issue in *YMax* and *CoreTel*. This Court is the proper forum to resolve the matter, regardless whether "*YMax* controls the tariff interpretation issue and directs a ruling in AT&T's favor," *see* AT&T Supp. Resp. 7, and I will not refer it to the FCC. *See Advamtel*, 105 F. Supp. 2d at 511–12; *W. Pac. R.R.*, 352 U.S. at 65–66; *Great N. Ry.*, 259 U.S. at 291.

### B. Switching Charges on Prepaid Calling Card Services

As for the access charges related to PPCC services, AT&T insists that referral is not necessary because "the FCC has said that access charges [for PPCC services] must be 'based on the location of the called and calling parties.'" AT&T's Br. 5 (quoting *In re Regulation of Prepaid Calling Card Servs.*, 21 FCC Rcd. 7290, ¶ 27 (2006), *vacated in part on other grounds*,

509 F.3d 531 (D.C. Cir. 2007)). Viewing a call placed through PPCC services as one call, AT&T argues that, under the "'end-to-end' analysis" that the FCC employs, "intermediate switching or routing, like that provided by Broadvox, is ignored," such that a service provider like Broadvox does not provide the facilities to originate or terminate a call and therefore cannot impose access charges. *Id.*

Broadvox does not dispute that neither it nor its VoIP provider partner is involved in the second stage of a PPCC call. But, in Broadvox's view, PPCC calls involve two separate calls, with the customer dialing a separate number for each call, "the first terminating to the calling card platform and the second extending from the calling card platform to the end user for the second call." Broadvox Supp. Reply 12–13. Thus, Broadvox maintains, it "is, in fact, terminating calls in IP protocol, working with its PPCC partner, to the calling card platforms of its PPCC customers." *Id.* at 12. As Broadvox sees it, for the second call, the customer "begin[s] using the service of another provider, the PPCC provider." *Id.* at 13. Broadvox seeks compensation for the first call only, which it insists "terminates in IP protocol to the PPCC platform." *Id*. Broadvox argues that the VoIP symmetry rule supersedes all precedent that it is not entitled to charge for an IP provider terminating the call.[5]  Broadvox Resp. 9–10.

AT&T contends that these charges are distinct from the VoIP access charges that the 2015 Declaratory Ruling addressed, "and nothing in the *Declaratory Ruling* even purports to address two-stage, prepaid calling card calls." AT&T Supp. Resp. 7. AT&T argues that, even if Paragraph 21 of the 2015 Declaratory Ruling states that the VoIP Symmetry Rule applies to services provided through partnerships with all types of VoIP providers, it only applies when

---

[5] Broadvox alternatively contends (in conclusory terms) that AT&T owes tandem switching charges for PPCC calls, even if the calls do not terminate at the platform. Broadvox Resp. 5; Broadvox Supp. 11; Broadvox Supp. Reply 14. Broadvox does not develop this argument, and AT&T has not responded to it.

"either Broadvox or its purported VoIP partner . . . provide[s] 'comparable' service to traditional access services charged by local exchange carriers," that is, when Broadvox or its VoIP partner provides the equivalent of a terminating service. AT&T Supp. Resp. 8. Indeed, in stating that "[c]ompetitive LECs may partner with a variety of VoIP partners and collect symmetrical access charges for covered services," the FCC conditioned its ruling: The LECs may collect access charges "as long as one of the partners jointly providing a call *delivers the end office switching functionality*." *In re Connect Am. Fund*, 2015 WL 628983, ¶ 21 (emphasis added). According to AT&T, for PPCC services, neither the services that Broadvox provides nor those that its VoIP partners provide are "'comparable' to the termination of a call to a called party," which is a service that "unaffiliated entities" provide in the second half of the call, and therefore Broadvox cannot impose terminating charges for its PPCC services. AT&T Supp. Resp. at 8–9.

Thus, the issue is whether a PPCC call is a single (but two-phased) call for which Broadvox only participates in the first phase and consequently does not provide terminating services, or two distinct calls, such that Broadvox provides terminating services for the initial call to the calling card platform. Broadvox does not cite any authority to support its position that a PPCC call is one call. AT&T cites as authoritative *In re AT&T Corp. Pet. for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Servs.*, 20 FCC Rcd. 4826 (F.C.C. 2005) (*Calling Card Order and Notice of Proposed Rulemaking*). There, it was AT&T that argued that PPCC calls, at least when an advertising message is communicated to the caller at the platform, consist of two calls, one to the platform and a second to the called party. *Id.* ¶ 23. The FCC rejected that argument, reasoning that "it cannot be the case that communication of the advertising message creates an endpoint because all calling card platforms engage in some form of communication with the calling party, and the Commission never has found this

communication to be relevant for jurisdictional purposes." *Id.* ¶ 23. The commission observed that, "[f]or purposes of determining the jurisdiction of calling card calls, the Commission has applied an 'end-to-end' analysis, classifying long-distance calls as jurisdictionally interstate or intrastate based on the endpoints, not the actual path, of each complete communication," such that a PPCC call routed via a platform and employing a second dialed number is nonetheless one call in which the platform is not a terminating point. *Id.* ¶ 5. AT&T also cites *In re Quest Communications Corp. v. Farmers & Merchants Mutual Telephone Co.*, 22 FCC Rcd. 17973 (F.C.C. 2007), in which the FCC noted that, for "calling card platform cases," it has "applied an end-to-end analysis and found that calls dialed in to a calling card platform and then routed to another party terminated with the ultimate called party, not at the platform," such that "there was one call (from A to B via the calling card platform), not two (A to the platform plus platform to B)." *Id.* ¶ 34. Clearly, the FCC already has provided sufficient guidance on how to approach a PPCC call, and a referral is not necessary. *See Advamtel*, 105 F. Supp. 2d at 513 n.13.

    **C.**     **Communications Act and *Quantum Meruit* Claims**

        *1.*     *Motion for reconsideration*

The third and fourth issues involve the merits of Broadvox's Communications Act and *quantum meruit* claims. AT&T attempts to use its primary jurisdiction briefing to renew its motion to dismiss the Communications Act claims based on Broadvox's failure, in AT&T's view, to allege liability in AT&T's capacity as a service provider, rather than a purchaser, insisting that "[s]uch claims are invalid as a matter of law under the FCC's precedents." AT&T's Br. 8–9. In my August 20, 2013 Order, ECF No. 16, I acknowledged this as a "close[]" issue" but denied AT&T's motion to dismiss on the record before me. AT&T also again moves to dismiss the *quantum meruit* claim, reiterating its contention that the claim is preempted

because "for the interstate, FCC-regulated services at issue, the FCC has held that Broadvox's exclusive means of recovery is either via a lawful tariff or an express, negotiated contract," and not through *quantum meruit*. AT&T's Br. 9–10. I rejected this argument as well, noting that although "[u]ltimately, AT&T may prevail," I was "unable to determine on the record before me, which notably d[id] not even include Broadvox's tariff, whether the services at issue are covered by the tariff or outside its scope." Aug. 20, 2013 Order 3. Essentially, AT&T asks me to reconsider these rulings, and I therefore will construe its request as a Rule 54(b) motion to reconsider an order that is not a final judgment. *See* Fed. R. Civ. P. 1; *Cezair v. JPMorgan Chase Bank, N.A.*, No. DKC-13-2928, 2014 WL 4955535, at *1 (D. Md. Sept. 30, 2014) (discussing Rule 54(b)) (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469–70 (4th Cir. 1991)).

Rule 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The standards for reviewing Rule 59(e) and 60(b) motions provide guidance for the review of a Rule 54(b) motion, *see Cezair*, 2014 WL 4955535, at *1, for which the Fourth Circuit has not stated a standard, *see Fayetteville Investors*, 936 F.2d at 1472; *see Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003) (same). *See, e.g.*, *Peters v. City of Mt. Rainier*, No. GJH-14-955, 2014 WL 4855032, at *3 n.1 (D. Md. Sept. 29, 2014) (looking to Rule 60(b) standard); *Harper v. Anchor Pkg. Co.*, Nos. GLR-12-460, GLR-12-462, 2014 WL 3828387, at *1 (looking to Rule 59(e) standard); *Potter v. Potter*, 199 F.R.D. 550, 552 n.1 (D. Md. 2001) (applying Rule 59(e) standard).

A Rule 59(e) motion "need not be granted unless the district court finds that there has been an intervening change of controlling law, that new evidence has become available, or that there is a need to correct a clear error or prevent manifest injustice." *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 411 (4th Cir. 2010). Rule 60(b) provides overlapping, but broader, bases for relief from a court order: "mistake, inadvertence, surprise, or excusable neglect"; newly discovered, previously unavailable evidence; "fraud . . . , misrepresentation, or misconduct by an opposing party"; a void, satisfied, or discharged judgment, or "any other reason that justifies relief." Fed. R. Civ. P. 60(b). Notably, a motion for reconsideration "is not a license for a losing party's attorney to get a 'second bite at the apple.'" *Shields v. Shetler*, 120 F.R.D. 123, 126 (D. Co. 1988).

Here, AT&T argues for dismissal of the Communications Act on the basis that discovery has not revealed any evidence that its actions were unreasonable or discriminatory, such that it cannot be subject to a Communications Act claim. AT&T's Br. 9. In Broadvox's view, "[d]iscovery has established a pervasive pattern and practice of discriminatory conduct by AT&T." Broadvox Resp. 12. I cannot resolve this issue without reviewing documents produced in discovery (and not part of the record before me), in which case I would have to convert AT&T's quasi-motion to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). Moreover, the referenced documents are not currently before me, such that AT&T has not supported its position properly. *See* Fed. R. Civ. P. 56(c)(1)(A).

The only evidence that I would consider at the motion to dismiss stage—Broadvox's tariff, which "was integral to and explicitly relied on in the complaint" and may resolve the *quantum meruit* claim—still is not a part of the record. *See Tucker v. Specialized Loan Servicing, LLC*, ---- F. Supp. 3d ----, 2015 WL 452285, at *8 (D. Md. Feb. 3, 2015) (noting that,

to rule on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court may consider "any 'document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity'" (quoting *CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citations and quotation marks omitted))). Additionally, AT&T has not identified a change in the law or a clear error from which manifest injustice will result. *See Robinson*, 599 F.3d at 411; Fed. R. Civ. P. 59(e). Nor does AT&T claim excusable neglect or any misconduct by Broadvox. *See* Fed. R. Civ. P. 60(b). Therefore, AT&T's motion for reconsideration is denied. *See* Fed. R. Civ. P. 54(b); *see Cezair*, 2014 WL 4955535, at *1.

        2.        *Primary jurisdiction referral of Communications Act claims*

AT&T contends that, if not dismissed, the Communications Act issue should be referred to the FCC because it involves a reasonableness determination and "present[s] fact-intensive issues that call for FCC expertise and policy judgments," as "courts typically should not determine in the first instance whether a carrier's practice is 'reasonable' under Sections 201 or 202." AT&T's Br. 8–9. Broadvox insists that "a number of courts have retained jurisdiction to hear claims under sections 201 and 202." Broadvox Resp. 12. As I noted in my August 20, 2013 Order, whether Broadvox may state a claim under the Communications Act is a close call that I can resolve on summary judgment. At that time, the parties may supplement the record with any evidence of AT&T's alleged unreasonable or discriminatory practices—or evidence to the contrary—that would transform a purely contractual dispute into a Communications Act claim. It is undisputed that, even though the ultimate reasonableness of a carrier's practices may be an issue for the FCC, if guiding precedent does not exist, *see Advamtel*, 105 F. Supp. 2d at 511, 513 n.13, the issue of whether there is sufficient evidence to generate a genuine dispute of

material fact is within this Court's purview.  Therefore, I will not make a referral at the time.  *See id.*

   3. *Primary jurisdiction referral of* quantum meruit *claim*

In AT&T's view, if the Court does not dismiss the *quantum meruit* claim, then, although the Court (and not the FCC) would have jurisdiction to decide the claim, "the Court unquestionably could not consider Plaintiff's damages, because that would be akin to setting a rate, a function reserved for the FCC." *Id.* at 10.  As Broadvox sees it, the Court can make a damages determination "[b]ecause AT&T has already made admissions as to the value of the services in question."  Broadvox Resp. 15.  It is clear that a referral is not appropriate at this time, and I will reconsider the issue with regard to damages, should Broadvox prevail.

## III.   CONCLUSION

A primary jurisdiction referral is not necessary with regard to the issues raised in the tariff claims.  Nor is a referral necessary at this time with regard to the Communications Act and *quantum meruit* claims.

The parties are directed to submit by April 24, 2015 a joint proposed scheduling order to govern any remaining discovery and dispositive motions briefing.  Broadvox's Motion Requesting the Court to Establish a Summary Judgment Briefing Schedule, ECF No. 64, IS DENIED AS MOOT.

Date: April 10, 2015                                         /S/
                                                             Paul W. Grimm
                                                             United States District Judge